1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT TACOMA

8
9

PRECISION INDUSTRIAL
CONTRACTORS, INC., a Washington
Corporation,

Case No. 3:19-cv-05810

10

Plaintiff,

11

v.

12

JACK R. GAGE REFRIGERATION, INC.,
a Utah corporation, d/b/a ALPHA OMEGA
INDUSTRIAL; CHRISTOPHER M
MCCLELLAN and TAMI L MCCLELLAN,
husband and wife, and the marital
community comprised thereof, d/b/a CMC
CONSULTING, LLC; and, DANIEL
JASON HOYT, an individual; and JOHN
DOES 1-10.

13
14
15
16
17

**PLAINTIFF'S MOTION FOR
TEMPORARY RESTRAINING
ORDER AND ORDER TO SHOW
CAUSE RE: PRELIMINARY
INJUNCTION *WITH NOTICE***

**ORAL ARGUMENT REQUESTED**

18

Defendants.

19
20

## **MOTION**

21

    Plaintiff Precision Industrial Contractors, Inc. ("PIC") moves the Court pursuant

22

to the Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. § 1836 *et. seq.*, and

23

F.R.C.P. 65 and LCR 65 for the entry of a temporary restraining order with notice

24

("TRO") directing the Defendants to: (1) maintain the confidentiality of PIC's

25

confidential, proprietary, and trade secret information ("PIC's Confidential

26

Information"); (2) refrain from using, disseminating, disclosing, or misappropriating

**LANDERHOLM**
805 Broadway Street, Suite 1000
PO Box 1086
Vancouver, WA 98666
T: 360-696-3312 • F: 360-696-2122

PIC's Confidential Information; (3) preserve all hard copy and electronic documents in the Defendants' possession, custody, or control that contain PIC's Confidential Information; and, (4) not solicit, contact, or communicate with PIC's existing clients or use PIC's sales information for CMC Consulting, LLC or Jack R. Gage Refrigeration, Inc. d/b/a/ Alpha Omega Industrial, or any company or for any purpose. PIC seeks this interim relief in order to maintain the status quo pending a disposition on the merits of this dispute, as the requested relief will halt the improper use and dissemination of PIC's Confidential Information, as well as prevent spoliation in this matter. PIC also seeks an order to show cause why a preliminary injunction should be issued granting the above-listed relief.

## INTRODUCTION

This case is a classic example of unfair competition, in breach of valid and binding employment agreements, and misappropriation of confidential and trade secrets by employees of a company that decided it would be more lucrative to strike out on their own using PIC's customer list, contacts, bidding information, and key relationships with clients. The McClellans launched their own consulting service and solicited and obtained an offer for over $310,000 from PIC's existing client, Port Townsend Paper Corporation ("PTPC"). Separately, Hoyt took PIC's bidding information and trade secrets with him to a competitor, and immediately solicited PIC's client for over $58 million in work for his new company, Jack R. Gage Refrigeration d/b/a Alpha Omega Industrial. These actions were in direct violation of their respective Employment Agreements and applicable law.

Defendants Chris and Tami McClellan and Jason Hoyt are former employees of PIC, based in Woodland, Washington. As part of their employment with PIC, both of the McClellans and Hoyt entered into Employment Agreements with PIC that included prohibitions on, among other things, disclosing PIC's confidential, trade secret, and

PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER
TO SHOW CAUSE RE: PRELIMINARY INJUNCTION - 2
ANDB04-000001- 4364962_1

**LANDERHOLM**
805 Broadway Street, Suite 1000
PO Box 1086
Vancouver, WA  98666
T: 360-696-3312 • F: 360-696-2122

proprietary information, from servicing or soliciting PIC's customers during and after their employment with PIC, from diverting business from PIC, and from soliciting PIC's employees.

Unbeknownst to PIC, the McClellans and Hoyt each hatched their own plans to solicit PIC's customers and divert business away from their employer, in direct violation of their respective Employment Agreements. In the case of Hoyt, he also solicited PIC employees to leave their employment and join his new company, Alpha Omega Industrial. Again, this was expressly prohibited by his Employment Agreement.

PIC notified the Defendants of their contractual obligations and demanded that they cease and desist from further violations of their Employment Agreements. Thus far, the Defendants have refused to comply. The McClellans and Hoyt have made it clear that they will continue to illegally use PIC's confidential and trade secret information, will continue to solicit and service PIC's customers, and will continue to solicit PIC's employees to leave their employment.

## EVIDENCE RELIED UPON

PIC relies upon the Declarations of Eric Simensen, Jessie Baldwin, and Travis Pavelek, submitted in support of this Motion.

## BACKGROUND

### A.    PIC's business operations and confidential and trade secret information.

PIC is a heavy industrial contractor that provides project management, design and engineering, fabrication and machining, installation, and maintenance services to its clients. *See Declaration of Eric Simensen in Support of Motion for Preliminary Injuction*, ¶ 3 (hereinafter, "*Simensen Declaration*"). PIC also provides skilled workers to other companies and employers on an as-needed basis. *Id*. at ¶ 4. PIC operates nationwide and across a wide variety of industries. Its focus industries are pulp and paper, corrugating/packaging, food processing, and asphalt roofing. PIC generally

LANDERHOLM

805 Broadway Street, Suite 1000
PO Box 1086
Vancouver, WA  98666
T: 360-696-3312 • F: 360-696-2122

employs between 100 and 200 skilled workers in these industries, depending on the number and size of its projects. *Id*. at ¶ 3.

Over its 30 years in business, PIC has developed, acquired, and owns confidential and proprietary information that is not available to the public or its competitors to allow it to compete it a competitive industry.  PIC has developed unique and special relationships with its customers through a variety of methods.  This includes sending employees to trade shows to meet potential customers, identifying key individuals within potential customers and developing personal relationships with those individuals, researching customer needs allows PIC to proactively offer its services to customers, and maintaining frequent contact with key individuals in an effort to maintain existing relationships. *Id*. at ¶¶ 4-5.

PIC's knowledge of its customers' needs (e.g., maintenance schedules, repairs, re-fabrication, upgrades, or expansions) and relationships with key contact personnel provide opportunities for new or expanded work. *Id*. at ¶¶ 5-6. Maintaining relationships with key contact personnel is important to PIC's efforts in obtaining work from its customers and developing new customers. *Id*. at ¶ 6. This means that PIC's personal relationships that it develops is extremely important to obtaining new and continuing work from customers. It also means that PIC's bidding information and proposals are not publicly disclosed.

In addition to its customer and key contact list developed through years of relationship building and operations, PIC also developed bidding sheets and various formulas and processes to use in the bidding process. *Id*. at ¶ 8. PIC has negotiated preferred pricing from some of its suppliers, allowing it to carefully and accurately bid on projects and maintain its comfortable profit margins. *Id*. at ¶ 7. PIC also uses unique bidding formulas and spreadsheets that allow it to accurately bid projects using PIC's own labor, trucking, fabrication, and engineering costs. *Id*. at ¶ 8; *Declaration of Travis*

PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER
TO SHOW CAUSE RE: PRELIMINARY INJUNCTION - 4
ANDB04-000001- 4364962_1

LANDERHOLM

805 Broadway Street, Suite 1000
PO Box 1086
Vancouver, WA  98666
T: 360-696-3312 • F: 360-696-2122

Pavelek ("*Pavelek Decl.*"), ¶ 27. To allow PIC to formulate and submit competitive bids, PIC has developed computer programs and electronic spreadsheets to provide it with greater control over the bidding process. *Simensen Decl.*, ¶ 8. PIC has also established special relationships with suppliers, vendors, and subcontractors that allow it to cover things it cannot provide while still accurately bidding on projects and maintaining comfortable profit margins. *Id.* at ¶ 7. These bidding sheets contain PIC's internally created formulas and confidential information that allow it to quickly and accurately bid on new projects. *Id.* These programs and formula permit PIC to submit competitive bids, which PIC frequently tests using its tracking systems to learn and adjust through trial and error comparisons. *Id.*

PIC takes steps to keep its confidential, proprietary, and trade secrets private and secure, including by limiting access to key employees and by ensuring the information is not publically disclosed. *Id.* at ¶ 9, *Pavelek Decl.*, ¶ 28. The McClellans and Hoyt each signed an agreement stating that they will agree to keep the information confidential and will not disclose or divulge the contents to anyone else. *Id.* at ¶¶17, Ex. A, 18, Ex. B, 23, Ex. C.

**B.    PIC hires the McClellans and Hoyt, and requires each one to sign an Employment Agreement.**

PIC hired Tami McClellan, Chris McClellan, and Jason Hoyt within a short time period beginning in July 2018. PIC first approached Chris McClellan. He said he would be interested in joining PIC once he finished a project he was working on for another company, but he recommended that PIC hire his wife, Tami McClellan, and friend and former business colleague, Jason Hoyt. *Id.* at ¶¶ 12-14.  PIC hired Tami McClellan as a recruiter, and she signed an Employment Agreement on July 3, 2018. *Id.* ¶¶ 15-17, Ex. A.

LANDERHOLM

805 Broadway Street, Suite 1000
PO Box 1086
Vancouver, WA  98666
T: 360-696-3312 • F: 360-696-2122

PIC next hired Hoyt in or around July 2018 as a superintendent to work on a large job in Idaho. *Id.* at ¶¶ 18-19. PIC hired Hoyt along with 20 to 25 other workers who Hoyt had previously supervised or worked with on other jobs. *Id.* at ¶ 18. PIC subsequently promoted Hoyt to general superintendent. As part of this promotion, PIC provided Hoyt a salary and opportunities to earn bonuses based on sales, and Hoyt signed an Employment Agreement on or about August 14, 2019. *Id.* at ¶ 19, Ex. B.

PIC next hired Chris McClellan in or about September 2018, and he signed an Employment Agreement on September 15, 2018. *Id.* at ¶ 23, Ex. C. PIC hired Chris McClellan to assist with overall operations, which included having access to business management records. *Id.* at ¶ 23.

The McClellan's and Hoyt's Employments Agreements all include the following provisions regarding non-disclosure of confidential information, non-solicitation of PIC's employees, and non-solicitation and non-servicing of PIC's customers and clients:

> 5.      **Property of Employer.** Employee acknowledges that from time to time in the course of performing his or her duties under this Agreement, he/she shall have the opportunity to inspect and use certain property, both tangible and intangible, of the employer. Employee hereby agrees that said property shall remain the exclusive property of the Employer and Employee shall have no right proprietary interest in such property, whether tangible or intangible, including, without limitation, the Employer's customer and employee lists, business and marketing plans, books of accounts, computer programs and similar property.
>
> 6.      **Confidential and Proprietary Information.** Employee recognizes that, as a result of his/her employment hereunder, he/she will have access to confidential information, trade secrets, proprietary methods and other data which is the property of and integral to the operation and success of Employer and therefore agrees to be bound by the provision of this Agreement, which the parties agree and acknowledge to be

**LANDERHOLM**

805 Broadway Street, Suite 1000
PO Box 1086
Vancouver, WA  98666
T: 360-696-3312 • F: 360-696-2122

reasonable . . . Employee acknowledges that he/she will obtain unique benefits from his/her employment and the provisions contained in This Agreement are reasonably necessary to protect the Employer['.]s legitimate business interests, which include, among other things, the substantial relationships between the Employer and their clients referral sources, customers, employees and vendors as well as the goodwill established with these customers and individuals over a protracted period.

7.      **Trade Secrets.** Employee agrees that he/she will not divulge to any person, nor use to the detriment of the Employer nor use in any business competitive with or similar to any business of the Employer, at any time during the term of this Agreement or thereafter, any of the Employer['.]s trade secrets and or confidential and proprietary information. . . .

8.      **Return of Confidential Information.** Employee agrees that at the time of leaving his/her employment, he/she will deliver to Employer and not keep or deliver to anyone else, any and all notebooks, files, records, memoranda, documents and, in general, any and all  material relating to the Employer's business or constituting the Employer's property including any trade secret information or confidential and proprietary information.

9.      **Non-Solicitation of Employees**. Employee covenants that during the one (1) year period immediately following the termination of his/her employment for whatever reason[,] Employee will not either directly nor indirectly induce or attempt to induce any employee of the Employer to terminate his or her employment or to go to work for any other employer.

10.     **Non-Solicitation  and  Non-Servicing**. Employee agrees that during the term of his/her employment hereunder and for a period of one (1) year thereafter} [sic] Employee} [sic] shall not}[sic] directly or indirectly, solicit or contact any customer or client of Employer with a view to inducing or encouraging such client or customer to discontinue or curtail any business relationship with Employer within territories in which Employer conducts business. Employee further agrees that during his/her employment hereunder, and for a period of one (1) year thereafter, he/she will not, directly or indirectly, request or advise any customer or client of Employer to withdraw, curtail or cancel its business with Employer.

**L** **LANDERHOLM**

805 Broadway Street, Suite 1000
PO Box 1086
Vancouver, WA  98666
T: 360-696-3312 • F: 360-696-2122

> Employee further agrees that during his/her employment hereunder, and for a period of one (1) year thereafter} he/she will not} directly or indirectly service any customer or client of Employer within the Territory while in the course of engaging in any business or undertaking that is in competition with the business of Employer . . . and will not, within the Territory] directly or indirectly divert any business away from Employer. Employee agrees that these provisions are necessary in order to protect the goodwill of Employer and inside information about Employer's operation.

*Id*. at ¶¶ 17, 19, and 23, Exs. A-C.

## C.   The McClellans and Hoyt had access to PIC's trade secrets and confidential information.

During their employment with PIC, the McClellan's and Hoyt had access to, among other things, confidential, proprietary, and trade secret information, PIC's customers, invoices, bidding procedures and formulas, vendor and supplier information, pricing strategies, profit calculations, client lists and contact information, and prospective client information. *Id*. at ¶¶ 15, 21, and 23.

## D.   Chris McClellan transitions to project manager position at Port Townsend Paper.

Several months after PIC hired Chris McClellan, it assigned him to work as a project manager for its longtime customer, Port Townsend Paper Corporation ("Port Townsend Paper") in Port Townsend, Washington. *Id*. at ¶¶ 10, 24. PIC knew Port Townsend Paper had a large project on the horizon and wanted to provide a project manager to oversee the project. *Id*. at ¶ 25. This project was a multimillion dollar expansion known as the OCC project and would be completed in six to eight phases. *Id*. PIC reasonably expected to be awarded much of this work, based on its history of winning approximately 75% of projects bid to Port Townsend's other projects over the past several years. *Id*. at ¶ 26. On January 7, 2019, PIC submitted a proposal to Port Townsend Paper, which it accepted, for Chris McClellan to provide project management services on the OCC project. *Id*. at ¶¶ 27-28.



805 Broadway Street, Suite 1000
PO Box 1086
Vancouver, WA 98666
T: 360-696-3312 • F: 360-696-2122

1

**E.     The McClellans and Hoyt set up their competing businesses and orchestrate their exit from PIC.**

The McClellans and Hoyt suddenly resigned their employment with PIC within several weeks of each other beginning in early-February 2019. *Id*. at ¶ 29. Toward the end of 2018, PIC discovered that several workers Hoyt brought with him from Louisiana had falsified timecards. PIC terminated these employees. Hoyt claimed to be upset about PIC's decision and suddenly resigned, without notice, on February 11, 2018. *Id*. at ¶ 30. Tami McClellan also resigned suddenly without notice on the same day. *Id*. at ¶ 31. Tami McClellan erased her company computer and cellphone before she resigned. *Id*. at ¶ 32.

PIC asked Chris McClellan, after his wife suddenly resigned, whether he intended to resign. He assured PIC that he had no intentions of leaving PIC. *Id*. at ¶ 38. He then suddenly announced, on March 6, 2019, that he was resigning because he had formed his own company, CMC Consulting, LLC, to work directly for Port Townsend Paper. *Id*. at ¶ 39. PIC's President notified him that his Employment Agreement restricted his ability to providing services to PIC's customers for a period of one year after termination of his employment. *Id*.

The timing the McClellans' and Hoyt's resignations was not coincidental; PIC was already in discussions with Port Townsend Paper about performing work on the OCC project. *Id*. at ¶ 25. Mr. McClellan continued to serve as a project manager on the OCC project for Port Townsend Paper after his departure from PIC. *Id*. at ¶ 40. PIC bind on several phases of the OCC project, but learned that Chris McClellan had awarded these phases to a company previously unknown to PIC, Alpha Omega. *Id*. at ¶ 41. PIC learned that Hoyt either owned, worked for, or was associated with Alpha Omega. *Id*. PIC was awarded only one phase of the OCC project, despite its long history of successful bids on Port Townsend Papers' other projects. *Id*. at ¶ 42.

26

L A N D E R H O L M
805 Broadway Street, Suite 1000
PO Box 1086
Vancouver, WA  98666
T: 360-696-3312 • F: 360-696-2122

PIC's employees working at Port Townsend Paper soon notified Hoyt working on site under the name of Alpha Omega. *Pavelek Decl.* at ¶ 16. Hoyt informed a PIC employee that he had brought in over $58 million for Alpha, and that he could have done the same for PIC if PIC had listened to him. *Id.* at ¶ 20. Further, Hoyt told a PIC employee that PIC's bid on the steel fabrication phase was over $180,000 below what his company would have bid. *Id.* at ¶ 21. Hoyt would not have had access to this bidding information unless it was provided by Chris McClellan. *Id.* at ¶¶ 22-23. PIC believes that Chris McClellan shared PIC's bids with Hoyt and Alpha and allowed Alpha to underbid PIC on the remaining jobs. *Simensen Decl.* at ¶ 42.

Hoyt also solicited at least two PIC employees to leave PIC and join Alpha and work on the Port Townsend job site for "his company." *Pavelek Decl.* ¶¶ 18-20; *Declaration of Jesse Baldwin* ("*Baldwin Decl.*"), filed herewith, ¶ 6. Hoyt told one of these employees that him "whatever he wanted," and Alpha would hire them immediately. *Pavelek Decl.* ¶¶ 19-20. Hoyt was expressly prohibited from soliciting any PIC employees pursuant to the terms of his Employment Agreement.

**F.    PIC begins to discovery the extent of the McClellans' and Hoyt's wrongful actions.**

After the McClellans and Hoyt all quit and PIC learned about their activities, PIC began an investigation. PIC learned that the McClellans and Hoyt had engaged in several wrongful activities leading up to and following their respective resignations.

On January 31, 2019, before the McClellans or Hoyt had quit PIC, the McClellans requested and obtained a proposed contract document from Port Townsend Paper because the McClellans were planning to approach Port Townsend Paper about terminating its project management contract with PIC in favor of allowing Mr. McClellan to contract directly with Port Townsend Paper. *Simensen Decl.* ¶ 43a, Ex. E.

LANDERHOLM
805 Broadway Street, Suite 1000
PO Box 1086
Vancouver, WA 98666
T: 360-696-3312 • F: 360-696-2122

On February 5, 2018, while the McClellans were still employed by PIC, the McClellans submitted a proposed bid to have CMC replace PIC as Port Townsend Paper's contract manager. *Id*. at ¶ 43c, Ex. G. The McClellans simply "cut and pasted PIC's January 7, 2019 proposal into their February 5, 2019 proposal. *Id*. at ¶ 43c.

On February 14, 2019, Chris McClellan used PIC's computers to apply to Hall and Company to obtain insurance for his new company, CMC Consulting. *Id*. at ¶ 43d, Ex. H. In doing so, he indicated that his company commenced operations on February 13, 2019. *Id*.

On February 27, 2019, the McClellans submitted another proposal to Port Townsend Paper on behalf of CMC. *Id*. at ¶ 43e, Ex. I. This proposal was for $14,000 less than the prior proposal he submitted to Port Townsend Paper. On March 5, 2019, Chris McClellan submitted an invoice to Port Townsend Paper on behalf of his new company, and apparently received partial payment from Port Townsend Paper.  *Id*. at ¶ 43f, Ex. J. This all occurred before he resigned his employment with PIC.

**G.      PIC serves the Defendants with a Notice of Cease and Desist.**

On August 20, 2019, PIC's attorneys served the McClellans and Hoyt with separate Cease and Desist Letters. *Id*. at 45. The McClellans never responded to the letter and continue to work as project managers on the Port Townsend Paper OCC project in direct violation of their Employment Agreements. *Id*. at 46.

Hoyt also continues to work on the job for Alpha Omega. *Id*. at 47.  PIC also learned from a former employee that Hoyt visited a former customer of PIC, McKinley Paper Company in Port Angeles, Washington, about doing work for them, in violation of his Employment Agreement. *Id*. at ¶ 48.

On August 21, 2019, a business associate of Hoyt's, and a PIC former employee, Gabe Stanley, responded to PIC's Letter on behalf of his company, Alpha Omega Industrial Construction, LLC claiming that Hoyt was not working for his



1  company but was working for the defendant Jack R. Gage Refrigeration, which

2  company was working under the assumed business name of Alpha Omega Industrial. *Id.*

3  at ¶ 50.

4      On August 21, 2019, Defendant Gage Refrigeration requested a copy of Hoyt's

5  Employment Agreement and promised to have his lawyer contact PIC's counsel about,

6  but PIC never heard from the lawyer. *Id.* at ¶ 50. Absent immediate help from the Court,

7  the Defendants will continue to harm PIC's business and violate their Employment

8  Agreements. *Id.* at ¶ 51.

9              **LEGAL STANDARD AND JURISDICTION**

10     The Defend Trade Secrets Act ("DTSA") allows for an owner of

11  misappropriated trade secrets to bring a civil action under the DTSA if the trade secret

12  "is related to a product or service used in…interstate or foreign commerce." 18 U.S.C. §

13  1836(b)(1). Injunctive relief is available under the DTSA to prevent any "actual or

14  threatened misappropriation," as well as "require[e] affirmative actions to be taken to

15  protect the trade secret." 18 U.S.C. § 1836 (b)(3)(A)(i)-(ii).

16     This Court has original jurisdiction of this action under the DTSA, 18 U.S.C. §

17  1836(c) and 28 U.S.C. § 1331. This Court has supplemental jurisdiction over the other

18  claims asserted under 28 U.S.C. § 1367. Further, a federal district court may issue an

19  injunction to preserve the status quo even when subject matter jurisdiction is disputed or

20  unclear. *U.S. v. United Mine Workers of Am.*, 330 U.S. 258, 293 (1947).

21     To prevail on a motion for a TRO, a party must show "that he is likely to

22  succeed on the merits, that he is likely to suffer irreparable harm in the absence of

23  preliminary relief, that the balance of equities tips in his favor, and that an injunction is

24  in the public interest." *Am. Trucking Associations, Inc. v. City of Los Angeles*, 559 F.3d

25  1046, 1052 (9th Cir. 2009) (quoting *Winter v. Nat. Resources Defense Council*, 555 U.S.

26  7, 20 (2008). Injunctive relief is "an extraordinary remedy that may only be awarded

PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER
TO SHOW CAUSE RE: PRELIMINARY INJUNCTION - 12
ANDB04-000001- 4364962_1

**LANDERHOLM**
805 Broadway Street, Suite 1000
PO Box 1086
Vancouver, WA  98666
T: 360-696-3312 • F: 360-696-2122

upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22. Under the DTSA and the Washington Uniform Trade Secrets Act, a court may grant an injunction to prevent any "actual or threatened misappropriation." 18 U.S.C. § 1836(b)(3)(A); RCW 19.108.020.

A movant seeking the issuance of a TRO must satisfy Federal Rule of Civil Procedure 65(b), which requires a showing "that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition" and "certification of efforts made to give notice and reasons why it should not be required." Fed. R. Civ. P. 65(b)(1).

Here, the Employment Agreements each state that in the event of a breach, PIC will suffer irreparable injury and damage, and PIC shall be entitled to injunctive and other equitable remedies.

## **ARGUMENT**

PIC requests a TRO to maintain the confidentiality of its Confidential Information, to stop the Defendants from using, disseminating, disclosing, or misappropriating its Confidential Information, and to stop the Defendants from soliciting, contacting, or communicating with PIC's existing clients. In addition, PIC requests that the Defendants be ordered to preserve all evidence related to this case under Fed. R. Civ. Pro. 26(d)(1) and be enjoined from altering, destroying, or disposing of any materials related to this action, including any confidential information obtained from PIC.

## A.   TRO

### a.   Likelihood of Irreparable Injury

"An intention to make imminent or continued use of a trade secret or to disclose it to a competitor will almost always certainly show irreparable harm." *Pac. Aero. & Elecs., Inc. v. Taylor*, 295 F. Supp. 2d 1188, 1198 (E.D. Wash. 2003) quoting *Campbell*



805 Broadway Street, Suite 1000
PO Box 1086
Vancouver, WA  98666
T: 360-696-3312 • F: 360-696-2122

*Soup Co. v. ConAgra*, Inc., 977 F.2d 86, 92-93 (3rd Cir. 1992); *North Atlantic Instruments, Inc. v. Haber*, 188 F.3d 38, 49 (2nd Cir. 1999) (loss of trade secrets cannot be measured in money damages). "In general, the imminent use of a trade secret constitutes irreparable harm. This is particularly true when the trade secret is a customer list." *Language Line Servs. v. Language Servs. Assocs.*, 944 F. Supp. 2d 775, 782-83 (N.D. Cal. 2013) (quoting *Gallagher Benefits Servs., Inc. v. De La Torre*, 2007 WL 4106821, *5 (N.D. Cal. Nov. 16, 2007)).

"Evidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm." *Stuhlbarg Int'l Sales Co., v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001). In cases such as this, when a former employee uses confidential information to compete, irreparable harm is "unquantifiable." *See Markovits v. Venture Info Capital, Inc.*, 129 F. Supp. 2d 647, 661 (S.D.N.Y. 2001) ("[The former employee's] continued use of [the company's] confidential information, and [his] inevitable competition based thereon, will likely cause serious damage to [the company's] reputation and client base.… The measure of this damage is simply unquantifiable." And, courts have deemed customer lists as protectable trade secrets. *U.S. v. Nosal*, 844 F.3d 1024, 1043 (9th Cir. 2016).

Here, PIC has already suffered both actual damages and continues to face threatened and irreparable damage by the McClellan's and Hoyt's improper actions. They took valuable bidding, labor, fabricating, manufacturing, and trucking costs with them, including PIC's bidding formulas and spreadsheet. They then used PIC's trade secrets to start their own competing companies, CMC Consulting and Alpha Omega. In the case of CMC Consulting, the McClellans formed the company, set up the business, submitted bids lower than the one Chris submitted for PIC, and received payment before leaving PIC.

LANDERHOLM

805 Broadway Street, Suite 1000
PO Box 1086
Vancouver, WA 98666
T: 360-696-3312 • F: 360-696-2122

Hoyt has done the same with Alpha Omega. He took the confidential information and trade secrets with him, and then used that information to compete directly with PIC on the PTPC job. Hoyt has on at least two occasions attempted to hire PIC employees that are working on the PTPC job. Hoyt has bragged to PIC employees that he took $58 million in business from PIC for his company, Alpha Omega. The damages are clear.

Besides the financial impacts, the Defendants' actions have damaged PIC's reputation, good will, and business relationships. The fact that Defendants have started competing businesses, are actively bidding on jobs using PIC's trade secrets, and remain in possession of PIC's trade secrets, demonstrates that PIC will suffer immediate and irreparable harm without injunctive relief. *See Tom Doherty Associates, Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 38 (2d Cir. 1995) (irreparable harm exists when there is "a threatened imminent loss that will be very difficult to quantify at trial.").

PIC has demonstrated the likelihood of irreparable injury justifying entry of a temporary restraining order.

**b.      Likelihood of Success on the Merits**

**(1)      PIC is likely to succeed on its DTSA and WUTSA claims**

PIC has brought claims under the DTSA, WUTSA, and claims of conversion, tortious interference, breach of fiduciary duty, breach of contract, and unjust enrichment, among others. The DTSA allows an "owner of a trade secret that is misappropriated" to bring a civil action if the "trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b). Under the DTSA, a "trade secret" includes:

LANDERHOLM

805 Broadway Street, Suite 1000
PO Box 1086
Vancouver, WA  98666
T: 360-696-3312 • F: 360-696-2122

all forms and types of financial, business,…[or] economic [] information, including…compilations,…methods, techniques, processes, procedures, [or] programs [], whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—

(A) the owner thereof has taken reasonable measures to keep such information secret; and

(B) the information derives independent economic value, actual or potential, from not being generally know to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information;

18 U.S.C. § 1839(3).[1] The DTSA defines misappropriation as:

(A)      acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or disclosure or use of a trade secret of another without express or implied consent by a person who—

(i)      used improper means to acquire knowledge of the trade secret;

(ii)      at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was—

(I)      derived from or through a person who had used improper means to acquire the trade secret;

(II)      acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or

---

[1] The WUTSA defines a "trade secret" as "…information, including a formula, pattern, compilation, program, device, method, technique, or process that: (a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." RCW 19.108.010(4).

 **LANDERHOLM**

805 Broadway Street, Suite 1000
PO Box 1086
Vancouver, WA  98666
T: 360-696-3312 • F: 360-696-2122

1

2

3

4

5

6

7

8

9

                   (III)     derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or

          (iii)   before a material change of the position of the person, knew or had reason to know that—

                   (I)     the trade secret was a trade secret; and

                   (II)    knowledge of the trade secret had been acquired by accident or mistake;

10   18 U.S.C. § 1839(5). Finally, the DTSA defines "improper means" to include "theft,

11   bribery, misrepresentation, breach or inducement of a breach of a duty to maintain

12   secrecy, or espionage through electronic or other means…." 18 U.S.C. § 1839(6).

13         Under the WUTSA, misappropriation of a trade secret involves: (a) acquisition

14   of a trade secret of another by a person who knows or has reason to know that the trade

15   secret was acquired by improper means; or (b) disclosure or use of a trade secret of

16   another without express or implied consent by a person who: (i) used improper means to

17   acquire knowledge of the trade secret; or (ii) at the time of disclosure or use, knew or

18   had reason to know that his or her knowledge of the trade secret was (A) derived from

19   or through a person with utilized improper means to acquire it, (B) acquired under

20   circumstances giving rise to a duty to maintain its secrecy or limit its use, or (C) derived

21   from or through a person who owed a duty to the person seeking relief to maintain its

22   secrecy or limit its use; or (iii) before a material change of his or her position, knew or

23   had reason to know that it was a trade secret and that knowledge of it had been acquired

24   by accident or mistake. RCW 19.108.010(2). Coverage under this act applies to a wide

25   range of property, not just designs and formulas.

26

LANDERHOLM

805 Broadway Street, Suite 1000
PO Box 1086
Vancouver, WA  98666
T: 360-696-3312 • F: 360-696-2122

RCW 19.108.020 specifically authorizes injunctive relief in cases of threatened misappropriations. Washington courts have found injunctive relief appropriate where there is high probability of inevitable and immediate use of trade secrets. *Boeing v. Sierracin*, 108 Wn.2d 38, 62-63 (1987); *Progressive Animal Welfare Soc'y v. Univ. of Wash.*, 125 Wn.2d 243, 262 (1994).

In addition, injunctive relief does not preclude a plaintiff from also seeking and being granted other forms of damages. *Pacific Aerospace & Electronics, Inc. v. Taylor*, 295 F. Supp.2d 1188 (W.D. Wash. 2003). In *Nowogroski Ins., Inc. v. Rucker*, 137 Wn.2d 427 (1999), the court allowed a former employer to obtain injunctive relief or economic damages when a former employee sought to use a trade secret to gain a competitive advantage. 137 Wn.2d at 437.

Here, the McClellans and Hoyt improperly took PIC's confidential information while they were employed with the Company, violating both the DTSA and WUTSA. The information at issue, customer lists, bidding formulas and spreadsheets that allow it to accurately bid projects using PIC's own labor, trucking, fabrication, and engineering costs cost information meets both the DTSA and WUTSA "trade secret" definitions. PIC derived significant economic value from the information and it tried to keep the information secret and outside the public realm. PIC kept the material password protected, and limited access to it within the Company, to control its dissemination.

The McClellans and Hoyt misappropriated the trade secrets through improper means by copying the information and forwarding emails and files to themselves. The McClellans and Hoyt owed express obligations through the Employment Agreements and common law duties of loyalty to their employer PIC, and their actions breached these duties. 18 U.S.C. § 1839(6). PIC is likely to succeed on the merits of its DTSA and WUTSA claims.

LANDERHOLM
805 Broadway Street, Suite 1000
PO Box 1086
Vancouver, WA  98666
T: 360-696-3312 • F: 360-696-2122

(2)     **PIC is likely to succeed on its breach of fiduciary claims and breach of contract claims**

Washington courts recognize the well-established common law duty of loyalty between an employee and his employer, even where no covenant not to compete exists. *Kieburtz & Assocs., Inc. v. Rehn*, 68 Wn. App. 260, 265-66 (1992). In like manner, "[u]nless otherwise agreed, an agent is subject to a duty not to compete with the principal concerning the subject matter of his agency." *Kieburtz*, 68 Wn. App. at 265. In *Nowogroski v. Rucker*, the Washington Supreme Court stated "while there is no reported case law on this issue in Washington subsequent to the adoption of the Uniform Trade Secret Act, common law in Washington prior to adoption of the Act holds that a former employee could not use confidential information of his or her former employer's customers to actively solicit their business." 137 Wn.2d 417, 444 (1999).

Under this duty, an employee must 1) act solely for the benefit of the employer in all matters connected with the employee's employment; 2) not disclose or use the employer's trade secrets; and, 3) not operate or support a competing business. *Id.*

Even where no covenant not to compete exists, Washington courts enforce a common law duty of loyalty between an employee and his employer. *See Kieburtz & Associates, Inc. v. Rehn*, 68 Wash.App. 260, 265-266 (1992). "During the period of his or her employment, an employee is not 'entitled to solicit customers for [a] rival business or to act in direct competition with his or her employer's business."

The seminal case in Washington, *Lewis Pacific Dairymen's Association v. G.E. Turner*, 50 Wn.2d 762 (1957), involved facts bearing striking similarity to those before this court. Turner worked for Valley Dairy, and its predecessor, for years. In 1955, he sought to purchase the dairy, but the parties reached no agreement. On August 26, 1955, Turner resigned from Valley Dairy effective September 15, 1955. However, while still employed by the dairy, Turner acquired Kaiser Dairy and changed its name to Turner's

**LANDERHOLM**

805 Broadway Street, Suite 1000
PO Box 1086
Vancouver, WA  98666
T: 360-696-3312 • F: 360-696-2122

Dairy. When Valley Dairy obtained a very large telephone order for the Olympia school district, Turner diverted it to his new competing business. In addition, Turner solicited other customers of Valley Dairy while still in its employ. Turner also attempted to entice all of Valley Dairy's employees to leave with him. Valley Dairy inadvertently learned of Turner's actions and could stop the hemorrhage and keep its doors open.

The court found that an employee "…is subject to a duty to the principle not to use or disclose to third persons, on his own account or on account of others, in competition with the principal or to his injury, trade secrets, written lists of names, or other similar confidential matters given to him only for the principals use or acquired by the agent in violation of duty." *Dairymen* at 776. The court upheld the injunction against Turner and his dairy, granted by a lower court with a few modifications.

In this case, the McClellans and Hoyt agreed to not service or solicit PIC's current or former customers. They were under an agreement, express or implied, to not cause any harm to their employer, PIC. As the Ninth Circuit held in *Keystone Fruit Mktg., Inc. v. Brownfield*, 352 F. App'x 169 (9th Cir. 2009), an employee is "not . . . entitled to solicit customers for [a] rival business before the end of his employment[,] nor can he properly do other similar acts in direct competition with the employer's business."

The McClellans ignored this fact and started CMC Consulting, a direct competitor of PIC, while still employed by PIC. Their actions breached their fiduciary duties they owed to PIC. Hoyt similarly breached his duties under his Employment Agreement when he solicited PIC's employees to work for his company and also when he solicited work from Port Townsend and McKinley Paper.

### (3)     Tortious Interference with Business Expectancy

To prevail on its claim of interference with business expectancy, PIC must show: 1) a business expectancy or valid contractual relationship existed; 2) defendants



knew about the relationship or business expectancy; 3) defendants intentionally caused a termination of the relationship or expectancy; 4) the defendants interfered for an improper purpose or used improper means; and, 5) damages resulted. *Pleas v. Seattle*, 112 Wn.2d 794 (1989). Once these elements are established, the defendants must justify the interference or showing that the actions were privileged, which they cannot do.

A business expectancy claim does not require proof of a specific contract. *Cherberg v. Peoples Nat. Bank of Washington*, 88 Wn.2d 595 (1977). Rather, the tort extends its protection to a future opportunity to consummate and obtain business relationships. *Caruso v. Local Union No. 690*, 107 Wn.2d 524 (1987). A claim for tortious interference is established when interference resulting in injury to another is wrongful by some measure beyond the fact of the interference itself. *Pleas*, 112 Wn.2d at 804.

The McClellans and Hoyt have acted both with an improper motive and by utilizing improper means. The McClellans stole the PTPC project management job from PIC by submitting a lower bid on behalf of their own company that they formed while still employed by PIC. They stole company time, resources, and confidential information. They also used company equipment while on company time to set up their competing enterprise. The same is true for Hoyt, as he even bragged to PIC employees that he took over $58 million in work from PIC by using PIC's bidding information and contacts to usurp opportunities that belonged to PIC.

c.      **Balance of Hardships Strongly Favors PIC**

The balance of hardships in this case compels the issuance of the injunctive relief because PIC has suffered, and will continue to suffer, harm if the McClellans and Hoyt are allowed to continue to try and divert customers using PIC's own proprietary and confidential information, trade secrets, and customer information for CMC Consulting and Alpha Omega. By contract, the Defendants will suffer no undue

PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION - 21
ANDB04-000001- 4364962_1

LANDERHOLM
805 Broadway Street, Suite 1000
PO Box 1086
Vancouver, WA  98666
T: 360-696-3312 • F: 360-696-2122

hardship if injunctive relief is granted, because the temporary restraining order would not prohibit them from engaging in activity that is proper. When the certainty of irreparable harm is weighed against the absence of hardship to the defendants, if the requested injunctive relief is granted, the balance of hardships weighs in favor of PIC. All that is being asked of the Defendants is that they comply with state and federal laws and their Employment Agreements, and not service or solicit PIC's customers or use its trade secrets and proprietary information.

### d. Granting the Requested Injunctive Relief Advances the Public Interest

Granting the requested injunctive relief would support the public's interests in protecting trade secrets under the WUTSA and DTSA by preventing unfair and unlawful business practices. And, the public interest is served when a defendant is asked to do no more than abide by trade laws and their obligations to their employer.

### B. The Court Should Not Require a Bond.

F.R.C.P. 65 vests the district court with discretion as to whether to require a bond, and if so, the amount of the bond required, if any. *See Jorgansen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003). The district court may dispense with the filing of a bond, and a strong likelihood of success on the merits may also favor "a minimal bond or no bond at all." *California v. Tahoe Regional Planning Agency*, 766 F.2d 1319, 1326 (9th Cir. 1985). In this case, PIC has shown a strong likelihood of success on the merits. PIC therefore requests this Court require no bond.

### CONCLUSION

The Defendants brazenly and openly snatched business opportunities from PIC in direct violation of their Employment Agreements and common law. Worse yet, when they decided to breach their Agreements they also chose to pilfer PIC's Confidential Information in the process and misappropriate valuable trade secrets and proprietary



LANDERHOLM
805 Broadway Street, Suite 1000
PO Box 1086
Vancouver, WA  98666
T: 360-696-3312 • F: 360-696-2122

1   information that PIC spent 30 years developing to help it create an economic advantage

2   in a highly competitive field. Rather than honoring their Employment Agreements and

3   leaving on the right and legal terms, they wanted to jump start their departures by taking

4   opportunities belonging to PIC, and in their own words, stealing over $58 million in

5   business from PIC. These actions should not stand, and the Court should enter a TRO to

6   maintain the status quo pending a hearing on preliminary injunction.

7          DATED this 30th day of August, 2019.

8                                LANDERHOLM, P.S.

9

10         /s/ Phillip Haberthur
           BRADLEY W. ANDERSEN, WSBA #20640
11         PHILLIP J. HABERTHUR, WSBA #38038
           Of Attorneys for Plaintiff,
12         Precision Industrial Contractors, Inc.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

LANDERHOLM
805 Broadway Street, Suite 1000
PO Box 1086
Vancouver, WA  98666
T: 360-696-3312 • F: 360-696-2122

## CERTIFICATE OF SERVICE

The undersigned hereby certifies as follows:

1. My name is Heather A. Dumont. I am a citizen of the United States, over the age of eighteen (18) years, a resident of the State of Washington, and am not a party of this action.

2. On the 30th day of August, 2019, I caused to be served the foregoing **PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE REGARDING PRELIMINARY INJUNCTION** *WITH NOTICE* by email and first class mail.

> *Defendant Jack R. Gage Refrigeration, Inc. d/b/a Defendant Alpha Omega Industrial*
>
> *JACK R. GAGE REFRIGERATION, INC. d/b/a ALPHA OMEGA INDUSTRIAL*
> *C/O JACK R GAGE, REGISTERED AGENT*
> *700 WEST 1700 SOUTH BLDG 29 STE 104*
> *LOGAN, UT 84321*
> *E-MAIL:  JACK@JRGREFRIGERATION.COM*
>
> *Defendants Christopher M McClellan and Tami L McClellan*
>
> *CHRIS MCCLELLAN and TAMI MCCLELLAN d/b/a CMC CONSULTING, LLC*
> *128 BUFFALO BLUFF RD*
> *PALATKA, FL 32177*
> *E-MAIL:*
> *CHRISMCCLELLAN1970@ICLOUD.COM*
> *TAMI.MCCLELLAN@YAHOO.COM*
>
> *Defendant CMC Consulting, LLC*
>
> *CMC CONSULTING, LLC*
> *C/O CATHERINE CAMPBELL, REGISTERED AGENT*
> *12048 160TH AVE SE*
> *RENTON, WA, 98059-0000*

PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER
TO SHOW CAUSE RE: PRELIMINARY INJUNCTION - 24
ANDB04-000001- 4364962_1



805 Broadway Street, Suite 1000
PO Box 1086
Vancouver, WA  98666
T: 360-696-3312 • F: 360-696-2122

1

2     E-mail:

3     *Defendant Daniel Jason Hoyt*

4        *DANIEL JASON HOYT*
         *25452 RED OAK ROAD*
5        *LIVINGSTON, LA 70754*
         E-MAIL: JASON.H@ALPHAOIND.COM
6

7

8        **I CERTIFY UNDER PENALTY OF PERJURY UNDER THE LAWS OF**

9     **THE STATE OF WASHINGTON AND UNDER PENALTY OF PERJURY**

10    **UNDER 28 USC SECTION 1746, THAT THE FOREGOING IS TRUE AND**

11    **CORRECT.**

12

13       DATED:  August 30, 2019

14       At:  Vancouver, Washington

15
                                   */s/ Heather Dumont*
16                                 HEATHER A. DUMONT

17

18

19

20

21

22

23

24

25

26



L A N D E R H O L M
805 Broadway Street, Suite 1000
PO Box 1086
Vancouver, WA  98666
T: 360-696-3312 • F: 360-696-2122